**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

FARID ALI BEYDOUN,

        Plaintiff,

v.

CHRYSLER LLC GROUP,

        Defendant.
_____/

CASE NO. 2:13-cv-13343

HON. MARIANNE O. BATTANI

**OPINION AND ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Before the Court is Defendant Chrysler Group, LLC's Motion for Summary Judgment. (Doc. No. 32). The Court heard oral argument on the motion on December 17, 2014, and at the conclusion of the hearing took the matter under advisement. For the reasons stated below, Defendant's motion is **GRANTED**.

**I.  STATEMENT OF FACTS**

    **A.  Beydoun's Employment with Chrysler**

Plaintiff Farid Beydoun began working at Chrysler as a spot welder in April 2000, a position subject to a collective bargaining agreement with UAW Local 1264. In October 2010, Beydoun became a Team Leader for one of the spot welding units. He maintains that he was one of the best Team Leaders at Chrysler and was an exemplary employee. Team leaders are not supervisors, but they are responsible for recording production data and providing coverage if someone needs a break from work. Team leaders report to separate supervisors, who in turn report to the area managers. Each plant also has a human resources department.

    **B.  Robert Bedford Incident**

Shortly after becoming a Team Leader in 2010, Beydoun began having disputes with some of his team members, as well as other hi-lo drivers from the material controls department. In fact, Beydoun acknowledged several conflicts during the three years in which he served as Team Leader. (Doc. No. 32, Ex. A, pp. 52-54, 67-78). One of the first incidents involved Robert Bedford, whom Beydoun claims called him a "fathead motherfucker" in May 2011. (Doc. No. 32, Ex. A, p. 89). In another related incident, Bedford said to him, "come a litter closer and see what happens to you." (Doc. No. 32, Ex. A, p. 93). In his deposition, Beydoun concedes that Bedford had problems with everyone and that he was upset with Beydoun because he was Team Leader. (Doc. No. 32, Ex. A, pp. 90-91). After the incident, Bedford left work and did not return for several months. However, in September 2011, Beydoun filed a grievance when he learned Bedford was returning. (Doc. No. 32, Ex. A, p. 94). The grievance was denied. Beydoun had no other incidents with Bedford other than one instance when Bedford drove by Beydoun and "smirked." (Doc. No. 32, Ex. A, p. 98).

  **C.** **Costell McIntosh Incident**

In January 2012, Beydoun got into a verbal altercation with hi-lo driver Costell McIntosh. According to Beydoun, McIntosh threatened him by saying "I'm the wrong motherfucking hi-lo driver to 'F' with." (Doc. No. 32, Ex. E). McIntosh denied the incident and also denied using profanity, because as a Jehovah's witness, it would be against his religion. (Doc. No. 32, Ex. A, p. 164). Both individuals were sent home that day. (Doc. No. 32, Ex. A, p. 165). After an investigation, human resources could not determine which party was being truthful. Therefore, both McIntosh and Beydoun were

docked 3-4 hours of pay. However, Beydoun filed a grievance challenging the dock in pay and had his penalty reduced to 2 hours. (Doc. No. 32, Ex. A, p. 165).

### D. Beydoun Files Union Charges

Several months later in October, Beydoun filed a charge against his Union with the National Labor Relations Board ("NLRB") regarding representation issues. (Doc. No. 32, Ex. H). In addition, he filed a charge against the Union with the Equal Employment Opportunity Commission ("EEOC") for religious discrimination arising out of the McIntosh incident. (Doc. No. 32, Ex. I). Beydoun claims that after he filed the NLRB charge, Union President Bobby Stuglin passed him in the hall and said, "man, why are you suing me?" (Doc. No. 32, Ex. A, pp. 221-23).

On October 31, Beydoun went to the Labor Relations Department and complained that his supervisor told him he could no longer work in excess of nine hours a day. Two meetings were held to discuss the issue, during which Beydoun claimed he was being retaliated against for filing charges against the Union. Human resources generalist Amanda Darr conducted an investigation and found no evidence of harassment or retaliation. (Doc. No. 32, Ex. L).

In November 2012, Beydoun filed a diversity complaint with Chrysler alleging that several Union officials discriminated against him based on his religion. (Doc. No. 32, Ex. F). Specifically, Beydoun asserted that McIntosh's religion (Jehovah's witness) was given preference over his because the investigation assumed Beydoun was lying about McIntosh's threat. As a result, Darr investigated the complaint. However, she found no evidence to substantiate the claim that McIntosh's religion was given preferential treatment or was even a factor in the January 2012 incident. (Doc. No. 32, Ex. G). In

her notes dated November 2, 2012, Darr mentions that "HR was unaware that the issue of religion was an issue during this investigation between Mr. Beydoun and Mr. McIntosh. (Doc. No. 32, Ex. K).

### E. Gary Dura Incident

On November 10, 2012, Beydoun told one of his supervisors to "kiss my ass" over a radio used on the plant floor. (Doc. No. 32, Ex. M, p. 26). Area Manager Gary Dura overheard the comment and believed Beydoun was arguing with a supervisor. He also thought Beydoun said "kick his ass." (Doc. No. 32, Ex. M, p. 29; Ex. N). He then asked to see Beydoun in his office to speak to him about "what was going on." (Doc. No. 32, Ex. M, p. 35). During the conversation, Beydoun claimed it was a joke and became irate, calling Dura a racist, a liar, and a coward, which Beydoun admitted during his deposition:

> Q: Okay. And Gary Dura is the one, your supervisor, or actually at the time was acting as the area manager, that you called a liar and a coward; is that right?
>
> A. Yes. Actually, it was a coward and a liar. Mixed up the words.

(Doc. No. 32, Ex. 150). As a result, Beydoun received a three-day disciplinary layoff. (Doc. No. 32, Ex. N).

### F. Beydoun Files EEOC Complaint Against Chrysler

In February 2013, several of Beydoun's team members petitioned for his removal as Team Leader, complaining of a hostile work environment. (Doc. No. 32, Ex. O). However, the petitions never amounted to Beydoun's removal because of personnel changes on the labor-management committee. (Doc. No. 32, Ex. B, pp. 21-24). A couple weeks later on February 28, 2013, Beydoun filed a charge of discrimination

against Chrysler with the EEOC. (Doc. No. 32, Ex. P). On May 6, 2013, the charge was dismissed. (Doc. No. 32, Ex. Q).

### G. Reed Comments

In June 2013, Beydoun was having lunch with Jill Reed, a supervisor in training. During the conversation, Beydoun mentioned that he wished his daughter would find a man who she will respect and obey, to which Reed responded, "No, no, no, no. That's an old saying. Don't say that." (Doc. No. 32, Ex. A, pp. 291-92). Later, Beydoun claims that Reed said, "Men in your culture treat women differently." He described the incident in his deposition:

> A: Basically, I was walking through the area . . . And then, yes, I got slightly upset. I wasn't yelling and screaming. I got slightly upset and I made the comment to her. I go, "Men in" – I go, "What do you mean men in my culture? Why would you say that?" I go, "My culture is American. I'm a United States Marine." And I think I said something to the effect, I go "What do you think, I drag my wife around the streets with a scarf?" I said, "You know what? Let's go to labor."
>
> Q: You wanted to go to labor over that?
>
> A: Absolutely.
>
> Q: And what was your complaint?
>
> A: My complaint?
>
> Q: Yes.
>
> A: Somebody telling me that men in your culture treat women differently because we're perceived as some dictators, some totalitarians, that we treat women differently?
>
> Q: That was not her words. Her words were, "I said men in your culture" period. Nothing more.
>
> A: No.
>
> Q: That's all she said.

5

A: No.

Q: You just said it.

A: She said, "Men in your culture treat women differently" or "think of them differently."

Q: So that's the entire statement now?

A: Yes.

(Doc. No. 32, Ex. A, pp. 294-96). Beydoun was offended by the comment and complained to the Labor Department. Darr, Beydoun, and Reed met to discuss the issue, and nothing else came of the incident.

**H.     Lawsuit and Termination from Chrysler**

Shortly thereafter, Beydoun filed the instant lawsuit in August 2013. Several months later on March 31, 2014, Beydoun was sitting at a picnic table with his head down. (Doc. No. 32, Ex. S). His supervisor, Richard Osuwu, approached him and asked if he was "alright." In response, Beydoun said, "I can't take it anymore" and threw a box of gloves against a fence. He then punched a board and said, "I can't take this shit no more" and "I just want to do my fucking job." (Doc. No. 32, Ex. S). Beydoun was escorted to the medical department and met with Labor Relations generalist Brittany Flack. In the statement he made to Flack, Beydoun claims supervisor Derrell Coleman was watching him from a cart "trying to catch him doing something wrong." (Doc. No. 32, Ex. T). Beydoun was later terminated for destroying company property. (Doc. No. 32, Ex. U).

On June 16, 2014, Beydoun filed a nine-count Second Amended Complaint alleging hostile work environment, discrimination, and retaliation in violation of Title VII, Michigan's Elliot-Larsen Civil Rights Act, and 42 U.S.C. § 1981.

6

**II.   STANDARD OF REVIEW**

Summary judgment is appropriate only when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).  Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  Once the moving party meets this burden, the non-movant must come forward with specific facts supported by affidavits or other appropriate evidence establishing a genuine issue for trial.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Fed. R. Civ. P. 56(c)(1)(A).  In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  The Court "must lend credence" to the non-moving party's interpretation of the disputed facts.  Marvin v. City of Taylor, 509 F.3d 234, 238 (6th Cir. 2007) (citing Scott v. Harris, 127 S. Ct. 1769, 1775 (2007)).  The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice.  Rather, there must be evidence on which the jury could reasonably find for the non-moving party. Hopson v.DaimlerChrysler Corp., 306 F.3d 427, 432 (6th Cir. 2002).

**III.   ANALYSIS**

7

Beydoun brings three counts of hostile work environment (Counts I, IV, VIII), three counts of discrimination (Counts II, V, VII), and three counts of retaliation (Counts III, VI, IX). Importantly, claims brought under Title VII, 42 U.S.C. § 1981, and Michigan's Elliot-Larsen Civil Rights Act are analyzed under the same evidentiary framework. See Jackson v. Quanex Corp., 191 F.3d 647, 658 (6th Cir. 1999). Thus, the Court will not differentiate between statutory context in its analysis.

### A. Hostile Work Environment

To establish a *prima facie* hostile work environment claim through circumstantial evidence, a plaintiff must show that: (1) he is a member of a protected class, (2) he was subjected to unwelcome verbal or physical conduct related to his membership in that class, (3) the harassment was based on his membership in that class, (4) the harassment had the purpose of creating an intimidating, hostile, or offensive work environment that is severe or pervasive, and (5) the employer knew or should have known about the harassment, but failed to take any action to prevent it. Barrett v. Whirlpool Corp., 556 F.3d 502, 515 (6th Cir. 2009). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993). The court may consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 23.

"In Title VII actions it is important to distinguish between harassment and discriminatory harassment in order to ensure that Title VII does not become a general

8

civility code." Bowman v. Shawnee State Univ., 220 F.3d 456, 464 (6th Cir. 2000) (citations omitted). After reviewing the record in a light most favorable to Beydoun, the Court finds that he did not establish a prima facie case of hostile work environment.

Although Beydoun certainly falls into a protected class, the record is entirely devoid of evidence supporting his claim that he suffered harassment at the hands of Chrysler employees because of his race, religion, or national origin. Beydoun concedes that the Bedford incident had nothing to do with his protected status. (Doc. No. 32, Ex. A, p. 90-91). In addition, Beydoun was actually treated more favorably in the outcome of the McIntosh incident by receiving less hours docked from his pay. Except for Jill Reed's isolated comments, Beydoun cannot point to any discriminatory motive underlying any of his other workplace disputes. As such, only Reed's comments can be considered in Beydoun's hostile work environment claim. Choulagh v. Holder, 528 F. App'x 432, 437 (6th Cir. 2013) ("As this Court has established, 'a plaintiff may cite a litany of perceived slights and abuses,' but the harassing acts are not part of the hostile work environment analysis if there is no proof that the harassment was based on national origin.").

Even assuming Jill Reed's comments were motivated by discriminatory animus, which is a generous interpretation of the incident, one isolated comment does not amount to a hostile work environment that is severe or pervasive. It is Beydoun's burden to show that his work environment at Chrysler was "'permeated with discriminatory intimidation, ridicule, and insult that is sufficient severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . .'" Barrett v. Whirlpool Corp. 556 F.3d 502, 515 (6th Cir. 2009)

9

(quoting Harris, 510 U.S. at 21)). In fact, Beydoun never claims that his work was affected by the alleged harassment, and even if he did, the record would not support such a claim. Though the Chrysler Stamping Plant may not qualify as utopian, no reasonable person would find the complained of workplace to be overly abusive. Consequently, Chrysler is entitled to summary judgment on Counts I, IV, and VIII).

## B. Discrimination

In order to establish a prima facie case of race, religious, or national origin discriminator, a plaintiff must demonstrate that (1) he is a member of a protected class, (2) he suffered an adverse employment action, and (3) the adverse action was taken under circumstances giving rise to an inference of unlawful discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). A plaintiff may demonstrate the last element by demonstrating that he was "treated differently from similarly situated individuals outside of his protected class." Smith v. City of Salem, Ohio, 378 F.3d 566, 570 (6th Cir. 2004).

Beydoun asserts that he was treated differently because of his protected status in three incidents: (1) his dispute with Costell McIntosh, (2) his conversation with Jill Reed, and (3) his suspension at the hands of Gary Dura. After review, the Court is not persuaded that any of these incidents were motivated by any discriminatory animus or that Beydoun was treated differently than other similar Chrysler employees.

With respect to the McIntosh incident, it is undisputed that both McIntosh and Beydoun received the same punishment. In fact, Beydoun actually received a lesser penalty after he filed a grievance. Contrary to Beydoun's claim, the investigator did not believe McIntosh's word over Beydoun's. Instead, no conclusion could be reached, and

so both employees received the same punishment. Thus, Beydoun cannot demonstrate that he was treated differently based on race, religion, or national origin.

Likewise, Beydoun's conversation with Jill Reed does not amount to actionable discrimination. Beydoun did not suffer any adverse employment decision. No reprimands were issued to either employee. Nonetheless, he inexplicably claims he was treated differently because Chrysler failed to discipline Reed for her comments. Chrysler did, however, investigate the incident, which satisfies its obligations to Beydoun and the Union. Of course, Chrysler's mere refusal to discipline an employee at the insistence of another does not fall within Title VII's purview.

Last, the incident between Beydoun and Gary Dura does not amount to discrimination. Although Beydoun suffered an adverse employment decision, there is no evidence that it was motivated by discriminatory animus. Rather, Dura had a legitimate basis for issuing the discipline after Beydoun called him a liar, racist, and a coward. Beydoun admitted to this outburst. Any reasonable supervisor in Dura's position would have issued discipline in the same situation.

Certainly, Beydoun had conflicts with several employees at Chrysler. Nonetheless, "federal law does not guarantee a utopian workplace or even a pleasant one. Personality conflicts between employees are not the business of the federal courts." Michael v. Caterpillar Fin. Services Corp., 496 F.3d 584, 600 (6th Cir. 2007). Beydoun's claims of discriminatory are nothing more than ordinary workplace conflicts. Beydoun cannot establish the second or third elements of his claims. Therefore, Chrysler is entitled to summary judgment on Counts II, V, and VII.

    **C.**    **Retaliation**

To establish a prima facie case of Title VII retaliation, a plaintiff must prove that: (1) he participated in an activity protected by Title VII; (2) the employer knew of his participation; (3) following his participation, an adverse employment action occurred or Plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal link between the protected expression and the adverse action or harassment. Hunter v. Sec. of U.S. Army, 565 F.3d 986, 995-996 (6th Cir. 2009) (citations omitted). If this showing is made, the defendant "must articulate a legitimate nonretaliatory reason for its action before the burden shifts back to plaintiff to show that the proffered reason was not its true reason but merely a pretext for retaliation," and that retaliation was the real reason. Harris v. Metro. Gov't of Nashville, 594 F.3d 476, 485-86 (6th Cir. 2010).

The only claim of retaliation that Beydoun raises in his response brief involves his filing of the EEOC complaint on October 25, 2012. The complaint states:

> On or about January 28, 2012, I was threatened by an African American hi-lo driver. On this same day I reported the incidents to management. On or about January 30, 2012, I filed a grievance with the Union and nothing was done. I was told by the Labor Supervisor that "because this African American hi-lo driver was Jehovah's Witness they believe[d] his story and I was lying. I believe that I have been discriminated against on the basis of my Religion Muslim and subjected to retaliation in violation of Title VII of the Civil Rights Act of 1964 as amended.

(Doc. No. 32, Ex. I). The complaint names "UAW" as the organization "that [he] believe[s] discriminated against me or others." (Doc. No. 32, Ex. I).

Beydoun claims that after he filed the EEOC complaint, his overtime hours were cut immediately. He directs this claim at Chrysler, the only named Defendant in this matter. However, the EEOC complaint was filed only against the Union: UAW Local 1264. The complaint makes no mention of Chrysler, and there is no evidence that

12

Chrysler knew about the EEOC charge. Maybe most importantly, during this time, Chrysler was required to honor the overtime equalization provisions outlined in the collective bargaining agreement for employees who were participating in an audit. (Doc. No. 32, Ex. W). In his deposition, Beydoun admits the Union was responsible for limiting his hours because he was participating in the audit at the time. (Doc. No. 32, Ex. A, p. 307) ("I want to clarify, you know, the union wanted it stopped and management allowed it."). There is no evidence that Chrysler even knew about the EEOC complaint, and thus reduced Beydoun's hours in retaliation. In fact, the record demonstrates that Chrysler repeatedly investigated Beydoun's complaints and took them seriously, which belies Beydoun's claim that Chrysler harbored ill will towards him for filing numerous grievances. As such, Beydoun cannot establish the second and fourth elements of his claim, and Chrysler is entitled to summary judgment on Counts III, VI, and IX.

### IV. CONCLUSION

Accordingly, there is no genuine dispute of material fact with respect to any of Plaintiff's claims. Defendant's motion for summary judgment is **GRANTED**.

**IT IS SO ORDERED.**

Date: February 5, 2015                    s/Marianne O. Battani
                                          MARIANNE O. BATTANI
                                          United States District Judge


CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on February 5, 2015.

                                          s/ Kay Doaks
                                          Case Manager